IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOSEPHINE WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:13-CV-470 |
| | ) | |
| CITIZENS INSURANCE COMPANY | ) | |
| OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

This matter is before the Court on the defendants' motions to dismiss and motions for summary judgment. The plaintiff, Josephine Wilson, has sued two Michigan insurance companies, alleging that they underpaid benefits owed under Michigan's no-fault insurance law to her daughter and ward, Gloria Wilson; Ms. Wilson also alleges negligence and violations of the Michigan Consumer Protection Act ("MCPA"). Ms. Wilson's negligence claim fails because she has not presented sufficient evidence of a breach of any duty, and her MCPA claim fails because there was no predicate consumer transaction with either defendant. The Court concludes that the defendants have waived the defense that Gloria Wilson was never eligible for no-fault benefits under Michigan law, but agrees that Ms. Wilson's right to recover is limited to underpayments since June 11, 2013. Therefore, the Court grants in part and denies in part the defendants' motions for summary judgment and dismisses their motions to dismiss as moot.

## UNDISPUTED FACTS

In 1974, Hosea Hammon purchased a car for his daughter, Gloria Wilson ("Gloria"). (Doc. 42-4 at ¶ 2.) Other than after immediately purchasing it, Mr. Hammon never drove the car. (Doc. 42-4 at ¶¶ 2, 5.) In 1976, Gloria moved out of Mr. Hammon's home to live with her mother, the plaintiff, Josephine Wilson ("Ms. Wilson"). (Doc. 42-4 at ¶ 4.) Gloria continued to use the car every day and only she drove it. (Doc. 42-5 at 4.)

On December 4, 1977, Gloria was involved in an accident while driving the car in Michigan. (Doc. 42-2 at 2.) The car was still titled and registered in Mr. Hammon's name. (Doc. 42-3 at 3; Doc. 42-6 at 5.) The accident caused severe injuries, leaving Gloria in a coma until March 1978. (*See* Doc. 58-5; Doc. 58-4 at 1.) At the time of the accident, Gloria's car had no insurance. (Doc. 42-12 at 2; Doc. 58-26 at 2.)

After the accident, Ms. Wilson became Gloria's guardian. (Doc. 42-12 at 3.) Because Gloria's car did not have insurance, Ms. Wilson, with an attorney's assistance, applied for Personal Injury Protection ("PIP") benefits under Michigan's No-Fault Insurance Act ("NFA") to pay for Gloria's medical care. (Doc. 42-12 at 2, 6-8.) The Michigan Department of State Assigned Claims Facility, (the Facility), which administers the no-fault insurance program, (*see* Mich. Comp. Laws § 500.3171; *see also Botsford Gen. Hosp. v. Citizens Ins. Co.*, 489 N.W.2d 137, 140 (Mich. Ct. App. 1992)), approved Ms. Wilson's request for benefits on behalf of Gloria. (Doc. 42-12 at 9-10.)

In April 1978, the Facility assigned Gloria's claim to Auto-Owners Insurance Company for servicing. (Doc. 42-12 at 9.) Before making payments, Auto-Owners began investigating Gloria's eligibility and hired an investigator to collect information on

the presence, if any, of insurance for the car or Gloria and the relationship between Gloria, the car, and Mr. Hammon. (*See* Doc. 42-12 at 11-12; Doc. 42-14 at 2, 4; Doc. 58-26.) The investigator sent its findings to Auto-Owners in September 1978 and reported that the car stayed at Ms. Wilson's home, Ms. Wilson had no cars titled in her name, and Gloria drove the car "on a regular basis." (Doc. 58-26 at 1, 6-7.) Auto-Owners had doubts about Gloria's eligibility for benefits, (*see* Doc. 42-14 at 2-3), but never communicated those doubts to Ms. Wilson or Gloria.[1] While the exact date is not clear from the record, Auto-Owners began making payments at some point between September 1978 and February 1979. (*See* Doc. 42-12 at 12; Doc. 58-2 at 1.) Once it began payments, Auto-Owners never reopened Gloria's claim for investigation and never stopped paying benefits.

In 1980, Auto-Owners sued Mr. Hammon for reimbursement of PIP benefits paid to Gloria, alleging that Mr. Hammon "was the owner" of the car and did not have insurance. (Doc. 58-20 at 1-2); *see also* Mich. Comp. Laws § 500.3177(1) (allowing "insurer[s] obligated to pay [NFA] benefits" to "recover such benefits. . .from the owner or registrant of the uninsured motor vehicle"). The parties stipulated and agreed to a

---

[1] Auto-Owners contends that Gloria's health made investigating Gloria's eligibility difficult, (*see* Doc. 42-14 at 2; *see also* Doc. 42 at 9), but nothing indicates that Auto-Owners reopened its investigation after receiving reports that Gloria had regained more memory and cognitive function. (*See, e.g.*, Doc. 58-2 at 15 (August 1979: Gloria "looks great [and] is bright, alert, and optimistic" and "[h]er [memory] recall has improved"); Doc. 58-2 at 26 (July 1980: Gloria is beginning to remember information from before the accident); Doc. 58-2 at 34 (March 1981: Gloria has improved communication skills and seems "quite proud" of her memory improvements); Doc. 58-3 at 1-2 (February 1983: Gloria's "memory and recall seem to be fairly good and she is able to remember occurrences prior to her accident").)

money judgment against Mr. Hammon. (Doc. 58-22 at 1.) Auto-Owners serviced Gloria's claim from 1978 to 1998. (*See* Doc. 42-12 at 10; Doc. 40-6; Doc. 42-24 at 2.)

Gloria is confined to a wheelchair. (Doc. 58-11 at 1-4, 4; Doc. 58-15 at 5.) Ms. Wilson performs and has performed most, if not all, of Gloria's care, including assisting with many activities of daily living. (*See, e.g.*, Doc. 58-2 at 1, 7; Doc. 58-4 at 39-40; Doc. 58-15 at 1-2, 8.) Auto-Owners paid Ms. Wilson approximately $20 per day for Gloria's care, (Doc. 58-15 at 3, 5-8), the "maximum amount" according to Auto-Owners. (Doc. 58-15 at 6.) It is not clear from the record how Auto-Owners determined this payment amount. Ms. Wilson did not request or agree to the $20-per-day rate, and Auto-Owners' representative, Sue Kael, could not remember why Ms. Wilson received $20 per day for attendant care or whether Auto-Owners explained to Ms. Wilson that she could receive more.[2] (Doc. 58-16 at 16-17.) Auto-Owners did not receive any complaints about payments. (Doc. 58-15 at 3.)

In August 1998, the Facility reassigned Gloria's claim to Citizens Insurance Company of America ("Citizens"). (Doc. 40-6; *see also* Doc. 1.) Citizens initially continued the $20-per-day rate set by Auto-Owners, (Doc. 59-1 at 1-2), but, between 2000 and 2002, Citizens increased the rate several times to $30, $38, and $44 per day. (Doc. 59-1 at 8-10.) Ms. Wilson and Gloria moved to North Carolina in 2010, (Doc. 40-

---

[2] Ms. Kael testified that initially servicing insurers would give the Facility a rate, which would agree or disagree, but that at some point the Facility started giving insurers the rates. (Doc. 58-16 at 7-8.)

2 at 7-8), and Gloria continues to receive benefits from Citizens today.  (*See* Doc. 40-2 at 9-15; Doc. 59-1 at 42-44.)

## BACKGROUND: MICHIGAN INSURANCE LAW

The NFA regulates the insurance of motor vehicles and the payment of benefits resulting from motor vehicle accidents in Michigan.  *Cruz v. State Farm Mut. Auto. Ins. Co.*, 648 N.W.2d 591, 594-95 (Mich. 2002).  The NFA requires every Michigan motorist to purchase "no-fault insurance" in order to legally operate a vehicle.  *See* Mich. Comp. Laws § 500.3101(1); *see also Shavers v. Kelley*, 267 N.W.2d 72, 77 (Mich. 1978).  Under the NFA system, if an insured motorist has an accident, no-fault insurance pays for certain expenses and services regardless of who caused the accident.  *See* Mich. Comp. Laws § 500.3105(2); *see also Auto-Owners Ins. Co. v. Biddis*, 309 N.W.2d 192, 193 (Mich. Ct. App. 1981).  PIP benefits are the part of a no-fault policy that pays for medical expenses and caregiver services.  *See* Mich. Comp. Laws § 500.3107(1); *see also Cruz*, 648 N.W.2d at 592.

Under the NFA, if a person was the "owner" of a car involved in an accident and did not have no-fault insurance at the time of the accident, that person may not receive PIP benefits or any other benefits payable under the NFA.[3]  *See* Mich. Comp. Laws

---

[3] When Gloria's accident occurred, the NFA did not specifically define the term "owner." *See State Farm Mut. Auto. Ins. Co. v. Sentry Ins.*, 283 N.W.2d 661, 662-63 (Mich. Ct. App. 1979) (holding that the Michigan Vehicle Code's definition of "owner" as any person "having the exclusive use" of a car "for a period of greater than 30 days" should be "read into" the NFA). After Gloria's accident, the NFA incorporated the Vehicle Code's definition of "owner" in a slightly broader form.  *See Botsford*, 489 N.W.2d at 140; *see also* Mich. Comp. Laws § 500.3101(2)(k)(1) (removing the exclusivity requirement and defining owner as a person "having the use of" a car "for a period that is greater than 30 days").  A car may have more than

§§ 500.3101(1), .3113(b), .3173; *see also Botsford*, 489 N.W.2d at 140. On the flip side, a person involved in an accident while driving an uninsured car may recover PIP benefits so long as that person is not the "owner" of the uninsured car. *See id.* at 141. If an eligible injured motorist does not have insurance, the Facility assigns the claim to an insurance company that acts as a "servicing insurer" and pays PIP benefits. *See* Mich. Comp. Laws § 500.3172; *see also Allstate Ins. Co. v. Great Lakes Ins. Co.*, No. 285883, 2010 WL 1814517, at *2 (Mich. Ct. App. May 6, 2010) (per curiam).

Servicing insurers must pay PIP benefits for "all reasonable charges" for "care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a). The NFA pays for attendant care, nursing, and other similar medical services, including feeding, bathing, exercising, medicating, and assisting the injured person, performed by family members at reasonable market costs. *See Van Marter v. Am. Fid. Fire Ins. Co.*, 318 N.W.2d 679, 683 (Mich. Ct. App. 1982). The NFA offers "unlimited lifetime benefits" for these "allowable expenses." *See Douglas v. Allstate Ins. Co.*, 821 N.W.2d 472, 482 (Mich. 2012); Mich. Comp. Laws § 500.3107(1)(a). Injured persons can also receive payments for lost wages for up to three years, *see* Mich. Comp. Laws § 500.3107(1)(b), and up to $20 per day for "replacement services," which are ordinary and necessary services the injured person would have performed but for the accident, such as lawn care, cooking, housekeeping, and household repairs. *See id.* § 500.3107(1)(c); *Smith v. State Farm Auto. Ins. Co.*, 30 F. Supp. 3d 657, 662 (E.D. Mich. 2014).

---

one "owner" under the NFA. *Ardt v. Titan Ins. Co.*, 593 N.W.2d 215, 218-19 (Mich. Ct. App. 1999).

## ISSUES AND ANALYSIS

In June 2013, Ms. Wilson instituted this action, bringing three claims against Citizens and Auto-Owners and one additional claim against Citizens only. (Doc. 1 at ¶¶ 25-59.) First, Ms. Wilson alleges that both defendants violated the NFA by failing to pay all available PIP benefits. (Doc. 1 at ¶¶ 25-31.) Second, Ms. Wilson alleges that both defendants breached certain duties she contends servicing insurers owe, including duties to pay and explain all available benefits, respond truthfully to inquiries, and conduct prompt investigations of claims, by failing to inform her of additional services payable under the NFA. (Doc. 1 at ¶¶ 17-24, 32-38.) Third, Ms. Wilson alleges that both defendants engaged in unfair or deceptive conduct in violation of the Michigan Consumer Protection Act by failing to pay all benefits owed and by failing to respond fully and truthfully to inquiries regarding benefits. (Doc. 1 at ¶¶ 45-59.) Fourth, Ms. Wilson brings a claim for "insurance bad faith" against Citizens, alleging that Citizens decreased benefits paid, delayed payments, and failed to fully disclose available benefits, and that these practices constitute unfair and deceptive practices.[4] (Doc. 1 at ¶¶ 39-44.)

Citizens and Auto-Owners contend that Ms. Wilson is not entitled to additional PIP benefits because Gloria was the "owner" of an uninsured vehicle at the time of her accident and was, therefore, never eligible for PIP benefits. (Doc. 40 at 11-13; Doc. 42 at 13-14.) The defendants assert that Ms. Wilson's claims fail because she cannot sue for

---

[4] Ms. Wilson's fourth claim is based on Citizens servicing Gloria's claim since 2010, when she and Gloria moved to North Carolina.

additional benefits to which Gloria was never entitled in the first place. (Doc. 40 at 14-15; Doc. 42 at 14-16.) The defendants also assert statute of limitations defenses, (Doc. 40 at 15-18; Doc. 42 at 17, 22-25), and contend that Ms. Wilson's non-NFA claims either fail to state a claim or are not supported by any evidence. (Doc. 40 at 19-25; Doc. 42 at 19-22, 24-25.)

## I.    Ownership

Ms. Wilson contends that Auto-Owners is precluded from raising the issue of Gloria's ownership and ineligibility because of res judicata, judicial estoppel, equitable estoppel, and waiver, (Doc. 58 at 7), and that Citizens is bound as successor to Auto-Owners and thus is similarly barred from raising the ownership issue. (Doc. 59 at 6-7.) The defendants cite several cases that hold that a servicing insurer's mere payment of benefits to a claimant does not preclude the insurer from later contesting the claimant's eligibility for benefits if the claimant sues. (*See* Doc. 40 at 13-14; Doc. 42 at 14-16.) The Court finds the cases cited by the defendants to be distinguishable in meaningful ways and concludes that Auto-Owners impliedly waived the right to contest Gloria's eligibility by conduct inconsistent with asserting that right. Citizens, as a subsequent servicer, steps into the shoes of Auto-Owners and is also deemed to have waived the defense.

### 1.  Waiver

"[W]aiver is the voluntary relinquishment or abandonment—express or implied—of a legal right or advantage. The party alleged to have waived a right must have had both knowledge of the existing right and the intention of forgoing it." *Reed Estate v.*

*Reed*, 810 N.W.2d 284, 290 (Mich. Ct. App. 2011) (internal quotation marks and

alterations omitted). "An implied waiver may arise where a person has pursued such a

course of conduct as to evidence an intention to waive a right, or where his conduct is

inconsistent with any other intention than to waive it." *Id.* (citation omitted). A court

may also find an implied waiver where a party's "acts and declarations manifest[] an

intent and purpose not to claim the supposed advantage" or where a party "so neglect[s]

and fail[s] to act as to induce a belief that there is an intention or purpose to waive." *Id.*

(citation omitted). Other circumstances, such as unreasonable length of time, also

evidence an intent to waive. *Burton Indus., Inc. v. Atlas Techs., Inc.*, No. 259052, 2006

WL 1290364, at *4 (Mich. Ct. App. May 11, 2006) (per curiam) (citation omitted).

The defendants rely on a line of NFA cases that hold that "[t]he fact that an insurer

has paid some benefits to an insured party does not preclude it from later asserting that it

owes nothing when the insured party files suit." *Calhoun v. Auto Club Ins. Ass'n*, 441

N.W.2d 54, 56 (Mich. Ct. App. 1989); *see also Golumbia v. Prudential Ins. Co.*, 116 F.3d

1480 (table), 1997 WL 345728, at *2-3 (6th Cir. June 20, 1997) (per curiam);

*Hammermeister v. Riverside Ins. Co.*, 323 N.W.2d 480, 482 (Mich. Ct. App. 1982) (per

curiam). Ms. Wilson contends that these cases are limited to situations where the

plaintiff's only evidence of waiver is an insurer's payment of benefits and that she has

produced additional evidence to support her claim of waiver. (*See* Doc. 58 at 7-11.)

While these cases permit a servicing insurer to make payments on a suspect claim

yet still contest eligibility if sued, they do not hold that waiver never applies in NFA

cases. Nothing in these cases states or even implies that a servicing insurer could never waive the right to contest a claimant's entitlement to benefits.

In *Calhoun*, the plaintiff was injured in a car accident in March 1984. *Calhoun*, 441 N.W.2d at 56. The servicing insurer paid for medical expenses that the plaintiff's HMO plan did not cover until November 1985 when, after a medical examination at the insurer's request, the insurer discontinued payments. *Id.* Thus, in *Calhoun*, it appears that the insurer continued to investigate the plaintiff's eligibility while making payments and immediately ceased payments upon receiving information that the plaintiff was ineligible.

Similarly, in *Golumbia*, the injured plaintiff applied for benefits under a disability policy, and the insurer began making payments after it determined that the plaintiff was not engaged in "gainful occupation." *See Golumbia*, 1997 WL 345728, at *1. The insurer periodically requested summaries of the plaintiff's income and requested the plaintiff's tax returns for the first time after four years of payments. *Id.* The returns indicated that the plaintiff had been receiving substantial income from other sources, and the insurer terminated payments. *Id.* As in *Calhoun*, the insurer regularly re-evaluated the plaintiff's eligibility by inquiring into his income, and then ceased payments immediately upon receiving information that he was ineligible. The *Golumbia* court noted that "[i]n the insurance context, waiver may be established either from affirmative acts of the insurer . . . or its nonaction with knowledge of the facts." *Id.* at *3 (internal quotation marks and citation omitted).

In *Hammermeister*, the plaintiff was in a car accident, and the servicing insurer paid wage-loss benefits under the NFA, reduced by the plaintiff's Social Security retirement benefits. *Hammermeister*, 323 N.W.2d at 481. The plaintiff sued, contending that the set-off was improper, and the trial court granted summary judgment in her favor. *Id.* The appellate court reversed, finding that there were disputed questions of fact as to whether the plaintiff was entitled to benefits in the first place and as to whether the insurer had waived that defense. *Id.* at 481-82. The court stated that "[t]he mere fact that the insurer paid some wage-loss benefits is insufficient by itself for us to hold that, in the event the insured filed suit objecting to the amount of benefits paid, the insurer is precluded from asserting that it owes the insured nothing at all." *Id.* at 482. However, the court noted that "[t]here may be more to [the plaintiff's] waiver and estoppel arguments than appears on the current record" and remanded the case for further proceedings. *Id.*

Here, Ms. Wilson has proffered undisputed evidence that the servicing insurers did much more than "merely" make payments. Unlike the cases cited by the defendants, Auto-Owners initially *delayed* payment while it investigated Gloria's claim, and it began making payments only after Ms. Wilson hired a lawyer, (*see* Doc. 42-12 at 12), and only after it fully investigated the possibility that Gloria was an owner of the uninsured car.

When it began paying benefits in 1978, Auto-Owners had largely the same evidence it has now. Auto-Owners received information from an investigator that the car stayed at Ms. Wilson's home, Ms. Wilson had no cars in her name, and Gloria drove the car "on a regular basis." (*See* Doc. 58-26 at 1, 6-7.) However, instead of investigating

further or denying the claim, Auto-Owners decided to begin paying Gloria PIP benefits. *Cf. Columbia*, 1997 WL 345728, at *3 ("In the insurance context, waiver may be established [by] nonaction with knowledge of the facts." (citation omitted)). Thus, this case is different from *Calhoun* and *Columbia* where the insurer began making payments while it investigated, regularly re-evaluated eligibility, and ceased payments immediately upon receiving information that the claimant was not eligible for benefits.

Once payments began, Auto-Owners never informed Ms. Wilson or Gloria that it had any doubts as to Gloria's eligibility and never conducted further investigation into Gloria's qualifications, even after she began to regain cognitive functioning from 1980 onward. (*See* Doc. 58-2 at 26, 34; Doc. 58-3 at 2); *see also supra* note 1. Instead, Auto-Owners sued Mr. Hammon in 1980, seeking reimbursement for benefits it paid to Gloria. (*See* Doc. 58-20.) The NFA allows "[a]n insurer *obligated to pay* [PIP] benefits" to a person to "recover such benefits paid . . . from the owner or registrant of the uninsured motor vehicle." Mich. Comp. Laws § 500.3177(1) (emphasis added). Auto-Owners cited § 500.3177 in its complaint as the basis for its claim against Mr. Hammon. (*See* Doc. 58-20 at ¶ 12.) To recover from Mr. Hammon as the "owner" of the uninsured car, Auto-Owners must be "obligated" to pay PIP benefits to Gloria, and if Gloria was an "owner" of the car, Auto-Owners would not have been "obligated" to pay PIP benefits to her. Thus, the 1980 lawsuit, by its very nature, involved an implicit, but necessary, contention that Gloria was entitled to benefits. As a result of the lawsuit, Auto-Owners

obtained a $25,000 judgment against Mr. Hammon.[5]  Thereafter, Auto-Owners made

uninterrupted payments for twenty years until the Facility reassigned Gloria's claim to

Citizens.  (*See* Doc. 42-12 at 12; Doc. 40-6; Doc. 42-24 at 2.)  During these twenty years,

the Facility paid Auto-Owners for handling Gloria's claim, (*see* Doc. 58-16 at 6-7), and

Auto-Owners' own internal reports characterized Gloria's claim as an "ongoing" and

"long-standing valid assigned claim."  (*See* Doc. 58-15 at 1-2, 4.)

Under these circumstances, Auto-Owners' entire course of conduct is inconsistent

with any intention of raising the ownership defense or contesting Gloria's eligibility, and

Auto-Owners has thus waived the ownership defense.  *See Reed Estate*, 810 N.W.2d at

290.  Under the NFA, Citizens steps into the shoes of Auto-Owners and has also waived

any ownership defense.[6]

### 2. Judicial estoppel

In the alternative, the Court finds that Auto-Owners is judicially estopped from

raising the ownership defense.  Under the doctrine of judicial estoppel, "a party who has

---

[5] This is unlike the situation in *Allen v. Farm Bureau Mut. Ins. Co. of Mich.*, No. 200392, 1999 WL 33447040 (Mich. Ct. App. Apr. 13, 1999) (per curiam), where the insurer was unsuccessful in its efforts to hold another party responsible for paying NFA benefits.  *See id.* at *1.  In any event, *Allen* is an unreported case with very different facts.

[6] Citizens takes the inconsistent positions that it is allowed to rely on Auto-Owners' investigation of Gloria's eligibility, and yet, at the same time, it is not bound by the results of that investigation and Auto-Owners' resulting decisions.  (*See* Doc. 40 at 13-14.)  It does not make sense to not hold Citizens accountable for its decision to rely on Auto-Owners' investigation and decisions.  Had Citizens conducted its own eligibility investigation, it might be entitled to a separate evaluation of whether its actions constituted waiver.  However, it did not.  Moreover, servicing insurers are assigned by the Facility, not chosen by claimants like Gloria, and Michigan's statutory scheme treats both defendants as servicers of Gloria's claim; thus, it is appropriate to treat them as the same for purposes of waiver on the undisputed facts here.

*successfully* and unequivocally asserted a position in a prior proceeding is estopped from asserting an inconsistent position in a subsequent proceeding." *Paschke v. Retool Indus.*, 519 N.W.2d 441, 444 (Mich. 1994) (citations omitted). For the doctrine to apply, "the claims must be wholly inconsistent." *Id.*

Auto-Owners' 1980 complaint alleged that Mr. Hammon "was the owner" of the car Gloria drove, that "[a]s a result, [Auto-Owners] has paid to on behalf of Gloria . . . , under the terms and provisions of the [NFA], sums in excess of $64,000 for [PIP] benefits," and that "Gloria . . . is requiring and *will continue to require* additional [PIP] benefits." (Doc. 58-20 at ¶¶ 3, 10 (emphasis added).) Further, Auto-Owners asserted that it "ha[d] incurred reasonable costs" in handling Gloria's claim "and *will continue to incur* additional costs in the future." (Doc. 58-20 at ¶ 11 (emphasis added).)

As noted *supra*, while the complaint does not explicitly state that Gloria is entitled to PIP benefits in the future or that Gloria was not an "owner" of the car, those statements are inherent in Auto-Owners' allegations because servicing insurers can only recover from the owner of the car if it is "obligated" to pay PIP benefits. *See* Mich. Comp. Laws § 500.3177(1). If Gloria was an "owner" of the car, Auto-Owners would not have been "obligated" to pay PIP benefits to her. As such, the complaint is "unequivocal." *See Paschke*, 519 N.W.2d at 444. Because seeking reimbursement from Mr. Hammon in 1980 is "wholly inconsistent" with Auto-Owners' current assertion that it does not owe Gloria additional benefits because she was also the "owner" of the uninsured car, Auto-Owners is judicially estopped from making this assertion. *See id.* As with waiver,

Citizens steps into Auto-Owners' shoes under the facts of this case and is also judicially estopped from raising the ownership defense.

Because the defendants waived any ownership argument, they are not entitled to summary judgment on Ms. Wilson's claim for underpayment of PIP benefits under the NFA, and the Court need not address the evidence on Gloria's ownership and use of the car nor Ms. Wilson's other contentions of res judicata and equitable estoppel.

## II.     One-year-back limit to recovery of PIP benefits

The defendants contend that even if Gloria's "ownership" of the uninsured car does not completely bar her claims, her recovery is limited to underpayments within one year of filing the complaint. (Doc. 40 at 15-18; Doc. 42 at 23.) This is correct.

A "claimant may not recover [PIP] benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced." Mich. Comp. Laws § 500.3145(1). This "one-year-back" rule thus limits recovery to "losses incurred within the one year preceding the filing of the action." *Devillers v. Auto Club Ins. Ass'n*, 702 N.W.2d 539, 547 (Mich. 2005). The rule may be tolled in "'unusual circumstances' such as fraud or mutual mistake." *Id.* at 556.

Ms. Wilson initiated this action on June 11, 2013. (Doc. 1 at 15.) She has not pled or offered evidence of any "unusual circumstances" such as fraud or mutual mistake that would toll the one-year-back rule. *See id.* at 547. The complaint makes no mention of mutual mistake. (*See* Doc. 1.) The fraud exception does not apply because Ms. Wilson has not presented evidence of any misrepresentation by either defendant or of reliance, (*see* Doc. 1); *see also Hord v. Envtl. Research Inst. of Mich.*, 617 N.W.2d 543,

546 (Mich. 2000) (per curiam) (listing the six elements of fraud.)  Neither Ms. Wilson

nor Gloria could recall any misrepresentation by either defendant.  When asked what

misrepresentations Auto-Owners made, Ms. Wilson said, "I don't recall that.  I really

don't know."  (Doc. 42-16 at 4.)  Gloria had no contact with either defendant.  (Doc. 40-3

at 4; Doc. 42-17 at 3.)

Ms. Wilson contends that "[e]quitable estoppel is one such unusual circumstance"

where the one-year-back rule does not apply.  (Doc. 59 at 8.)  While the Michigan

Supreme Court recognizes equitable estoppel as an exception to the general rule that

statutes of limitations run without interruption, it "has been reluctant to recognize an

estoppel [exception] absent intentional or negligent conduct designed to induce a plaintiff

to refrain from bringing a timely action."  *Cincinnati Ins. Co. v. Citizens Ins. Co.*, 562

N.W.2d 648, 651 (Mich. 1997) (per curiam) (emphasis omitted); *see also Devillers*, 702

N.W.2d at 556 n.64.  Here, there is no evidence that either defendant engaged in any

conduct "intended to forestall bringing an action."  *Cincinnati*, 562 N.W.2d at 651; *cf.*

*Bohlinger v. Detroit Auto. Inter-Ins. Exch.*, 327 N.W.2d 466, 470 (Mich. Ct. App. 1982)

(per curiam) (listing examples of a defendant's conduct that support estoppel).

Ms. Wilson relies on *Paquette v. State Farm Mut. Auto Ins. Co.*, No. 279909, 2009

WL 2168918 (Mich. Ct. App. July 21, 2009) (per curiam), to support her contention that

equitable estoppel applies and bars application of the one-year-back rule in this case.

(Doc. 59 at 9-11.)  However, *Paquette* involved a fraud claim separate and distinct from a

claim that a servicing insurer underpaid NFA benefits.  *See Paquette*, 2009 WL 2168918,

at *3.  It was in the context of the separate fraud claim that the court found that equitable

estoppel rendered the one-year-back rule inapplicable, *see id.* at *4-6, and nothing in *Paquette* appears to overrule the holdings in *Cincinnati* or *Devillers*.

Finally, Ms. Wilson contends that Gloria's "insanity" tolls the one-year limitation on damages and cites § 600.5851, the tolling provision in the Revised Judicature Act. (Doc. 58 at 20-21; Doc. 59 at 17); *see also* Mich. Comp. Laws § 600.5851(1). "The minority/insanity tolling provision in [section] 600.5851(1) does not apply to toll the one-year-back rule in [section] 500.3145(1) [of the NFA] because the one-year-back rule is a damages-limiting provision and does not concern when an action may be brought." *Joseph v. Auto Club Ins. Ass'n*, 815 N.W.2d 412, 424 (Mich. 2012).

Thus, the one-year-back rule bars Ms. Wilson from recovering from Auto-Owners and limits her right to recovery to underpayments by Citizens since June 11, 2013.

**III.   Negligence claim**

Ms. Wilson contends that the defendants breached certain duties that servicing insurers owe as a matter of law, including the duty to respond truthfully to inquiries, the duty to provide complete information, the duty to disclose all benefits available, and the duty to investigate promptly.  (Doc. 1 at ¶¶ 33-37; *see also* Doc. 1 at ¶¶ 17-24.)

"Michigan law imposes no affirmative duty on an insurer to act as an advisor with respect to informing an insured of benefits that are . . . provided by statute." *Brown v. Travelers Indem. Co.*, No. 8:08-cv-168-T-TBM, 2011 WL 41911, at *3 (M.D. Fla. Jan. 6, 2011) (applying Michigan law).  However, "in the negligence context, if one voluntarily undertakes to perform an act, having no prior obligation to do so, a duty may arise to perform the act in a non-negligent manner." *Id.* (internal quotation marks and alteration

omitted).  For example, when a party undertakes to respond to inquiries, "it may not give partial answers leading to false impressions or intended to mislead."  *Id.*  On the other hand, evidence that an insurer has a policy or general practice of telling people what benefits they can receive is not, by itself, sufficient to establish that the insurer assumed a duty to inform.  *See Basirico v. State Farm Mut. Auto. Ins. Co.*, No. 05-CV-74691, 2008 WL 2446906, at *6 (E.D. Mich. June 18, 2008).  Also, an insurer conveying its legal opinions of coverage to the insured cannot form the basis of liability because "it is incumbent upon the insured to seek legal assistance if he disagree[s]."  *Id.* at *5.

The defendants had no independent duty to inform Ms. Wilson of the benefits she could receive under the NFA.  *See Brown*, 2011 WL 41911, at *3.  Moreover, Ms. Wilson retained counsel to assist her in filing a claim for PIP benefits, and she could have sought his assistance if she disagreed with the defendants' interpretation of the NFA as to what they must pay her for Gloria's care.  *See Basirico*, 2008 WL 2446906, at *5.

As to her claims that the defendants failed to respond truthfully and completely to inquiries, Ms. Wilson has not presented evidence of any specific instances where either defendant did so.  Ms. Wilson testified that the only communication she had with anyone at Citizens was about a check; she contends that Citizens improperly sent the check to her lawyer, and she also took issue with the tone of an employee's voice.  (Doc. 40-2 at 23-26.)  Gloria has had no communication with Citizens.  (Doc. 40-3 at 4.)  When asked to what inquiries Auto-Owners did not fully and truthfully respond, Ms. Wilson said Auto-Owners "kept [a] check and didn't give it to [her].  Then . . . mailed it later on."  (Doc. 42-16 at 3.)  Gloria had no communication with Auto-Owners.  (Doc. 42-17 at 3.)  The

evidence does not indicate Ms. Wilson or Gloria ever made "a specific and direct inquiry" into what benefits were available, so the defendants had no duty to inform. *See Basirico*, 2008 WL 2446906, at *4.

Because Michigan law imposes no independent duty on insurers to explain benefits available under the NFA and because Ms. Wilson has presented no evidence of any partial responses either defendant made to inquiries regarding available benefits, Ms. Wilson's negligence claims fail.

## IV. Michigan Consumer Protection Act claim

The MCPA prohibits more than 30 methods, acts, and practices "in the conduct of trade or commerce," *see* Mich. Comp. Laws § 445.903(1)(a)-(kk), some of which require a predicate consumer transaction. *See DiPiero v. Better Bus. Bureau of W. Mich., Inc.*, No. 316308, 2014 WL 6679406, at *3 & n.1 (Mich. Ct. App. Nov. 25, 2014) (per curiam). In her complaint, Ms. Wilson lists eight prohibited acts she contends the defendants committed. (*See* Doc. 1 at ¶ 56.) The Court does not see how the conduct prohibited in § 445.903(1)(a), (c), and (e) would apply here. (*See* Doc. 1 at ¶ 56.) The five other subsections Ms. Wilson cites require a transaction either by their plain language, (*see* Doc. 1 at ¶ 56 (citing Mich. Comp. Laws § 445.903(1)(n), (x), (bb), (cc))), or based on Michigan case law. *See DiPiero*, 2014 WL 6679406, at *4 (discussing Mich. Comp. Laws § 445.903(1)(s)).

A "transaction" under the MCPA "connotes the mutual and reciprocal acts typical of business deals that alter the legal relationships of the parties." *Id.* Here, there were no mutual or reciprocal acts between Ms. Wilson or Gloria and either defendant. The

evidence is undisputed that Ms. Wilson applied to the Facility for PIP benefits, the Facility approved her request, and the Facility selected Auto-Owners to pay Gloria's benefits and later reassigned her claim to Citizens; neither Ms. Wilson nor Gloria selected an insurer or negotiated or agreed to an amount of benefits. (*See* Doc. 42-17 at 3; Doc. 42-16 at 5-6; Doc. 58-16 at 6-8, 17.) Because there was no consumer transaction and because no other body of law allows these claims, Ms. Wilson's MCPA claims fail.

## V. Claims under North Carolina law

Ms. Wilson contends that Citizens' conduct since she and Gloria moved to North Carolina in 2010 constitutes unfair, deceptive, and "bad faith" practices under North Carolina law. (Doc. 1 at ¶¶ 39-44.) This case involves a statutory scheme unique to Michigan, and applying North Carolina law as an overlay on Michigan's unique system does not make sense. Moreover, Ms. Wilson has not offered evidence sufficient to give rise to a disputed question of material fact concerning this claim. To the extent Ms. Wilson purports to assert a claim arising under North Carolina law, that claim fails.

## CONCLUSION

The defendants waived the defense that Gloria was never eligible for PIP benefits under Michigan's NFA, but the one-year-back rule limits Ms. Wilson's recovery to underpayments by Citizens since June 11, 2013. Therefore, the Court will grant Auto-Owners' motion for summary judgment in its entirety and grant in part and deny in part Citizens' motion for summary judgment as to Ms. Wilson's claim under the NFA. Because Ms. Wilson has not presented sufficient evidence that either defendant breached a duty, and because there was no predicate consumer transaction between Ms. Wilson or

Gloria and either defendant, the Court will grant the defendants' motions for summary judgment as to Ms. Wilson's negligence and MCPA claims. Because Ms. Wilson has not presented sufficient evidence to support her claims under North Carolina law, the Court will grant Citizens' motion for summary judgment as to this claim.

For the reasons stated herein, it is **ORDERED** that:

1. Defendant Citizens Insurance Company of America's motion for summary judgment, (Doc. 39), is **GRANTED IN PART** and **DENIED IN PART**, as stated herein, and its motion to dismiss, (Doc. 39), is **DENIED AS MOOT**.

2. Defendant Auto-Owners Insurance Company's motion for summary judgment, (Doc. 41), is **GRANTED**, and its motion to dismiss, (Doc. 41), is **DENIED AS MOOT**.

This the 13th day of February, 2015.

UNITED STATES DISTRICT JUDGE